## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

DEX MEDIA, INC. D/B/A DEXYP,

                     Petitioner,

    v.

COMMUNICATIONS WORKERS OF
AMERICA, AFL-CIO,

                  Respondent.

Case No.: 19-cv-321

### PETITION TO VACATE ARBITRATION AWARD

1.      This Petition is brought under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to vacate the Arbitrator's Award and Opinion of Jay Nadelbach ("the Arbitrator") dated February 8, 2019, a true and accurate copy of which is attached as **Exhibit 1**. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 185. Venue is proper under 29 U.S.C. § 185 and 28 U.S.C. § 1391.

### Facts

2.      Petitioner Dex Media, Inc. doing business as DexYP ("the Company") is a Delaware corporation headquartered at 2200 West Airfield Drive, DFW Airport, Texas 75261.

3.       The Company did business as Dex Media after it was formed by the merger of Dex One Corporation and SuperMedia Inc. ("SuperMedia") in 2013 and until acquiring YP Holdings and its subsidiaries in 2017.

4.      By its former name, Idearc Inc. ("Idearc"), SuperMedia was created in November 2006 when Verizon Communications Inc. ("Verizon") spun off its Verizon Information Services ("VIS") business. Idearc was renamed SuperMedia in 2010. VIS was created in 2000, in conjunction with Bell Atlantic Corporation and GTE Corporation merging to form Verizon.

5.      Respondent Communications Workers of America, AFL-CIO ("the CWA") is an unincorporated association and a "labor organization" as defined by 29 U.S.C. § 152(5), which is headquartered at 510 3rd Street NW, Washington, DC 20001.

6.      The CWA operates through administrative "Districts" with jurisdiction over particular states. At all relevant times: CWA District 1 has had jurisdiction over New York and New Jersey, among other states; and CWA District 2-13 has had jurisdiction over Pennsylvania, Maryland, and Virginia, among other states.

7.      In 2002, VIS recognized the CWA as the exclusive bargaining agent for: a bargaining unit consisting of positions at its Buffalo, New York sales office ("the Buffalo Unit"); separate bargaining units consisting of positions at other sales offices in New York state (with the Buffalo Unit, "the New York Units"); and separate bargaining units consisting of positions at sales offices in Maryland, Virginia, Pennsylvania, and New Jersey (with the New York Units, "the Card Check Units").

8.      During "off-table" negotiations, the CWA and VIS bargained a "model" first contract for the Card Check Units. Each Card Check Unit then ratified that model first contract as its first contract. That first contract for the Buffalo Unit had a term of February 9, 2003 to October 8, 2005 as executed by Joseph Gimilaro on behalf of VIS on April 18, 2003 and Dennis Trainor on behalf of the CWA on May 2, 2003 ("the First Contract").

9.      VIS and the CWA made a first successor "Agreement" for the Buffalo Unit, which had a term of February 5, 2006 to October 4, 2008 as executed in March 2006 by Peter Konrad ("Konrad") on behalf of VIS and Patricia M. Telesco ("Telesco") on behalf of the CWA ("the VIS Successor Agreement").

2

10.     Idearc and the CWA made a second successor "Agreement" for the Buffalo Unit, which had a term of February 1, 2009 to October 15, 2011 as executed in February 2009 by Elizabeth Dickson ("Dickson") on behalf of Idearc and Telesco on behalf of the CWA ("the Idearc Successor Agreement").

11.     The Arbitrator admitted the First Contract, the VIS Successor Agreement, and the Idearc Successor Agreement (collectively, "the Predecessor Agreements") respectively as Company Exhibit 4, Company Exhibit 3, and Company Exhibit 2.

12.     In August 2011, SuperMedia and the CWA made a "Memorandum of Agreement — Performance Improvement Plan (PIP) Transition" that covered all of the Card Check Units and was executed by Dickson, Telesco, and a second CWA representative ("the 2011 PIP MOA"), a true and accurate copy of which is attached as **Exhibit 2.**

13.     In June 2012, SuperMedia and the CWA made a successor Agreement that covered the New York Units and specified that each bargaining unit remained a separate unit ("the 2012 New York Agreement"), a true and accurate copy of which is attached as **Exhibit 3.**

14.     The 2012 New York Agreement had a term of May 7, 2012 to October 11, 2014 as executed by Dickson and Telesco in June 2012 and was later extended by agreement of the parties to October 2015.

15.     The 2011 PIP MOA was referenced in the 2012 New York Agreement and remained effective throughout the extended term of the 2012 New York Agreement.

16.     Petitioner is an employer as defined by 29 U.S.C. § 152(2), and the employees of the Buffalo Unit — as well as the employees of the other Card Check Units — are "employees in and industry affecting commerce" within the meaning of 29 U.S.C. § 185(a).

17.     While doing business as Dex Media, the Company employed Andrea Mayer ("Mayer") in positions in the Buffalo Unit.

18.     Throughout Mayer's employment, both the 2012 New York Agreement and the 2011 PIP MOA remained effective for the Buffalo Unit.

19.     The CWA filed a grievance over the termination of Mayer on August 12, 2015 ("the Grievance"), a true and accurate copy of which is attached as **Exhibit 4**.

20.     The Grievance was progressed through the initial steps of the contractual grievance process in a timely manner and was then denied by the Company in a timely manner at the last step of the contractual grievance process by letter dated November 3, 2015. A true and accurate copy of that letter is attached as **Exhibit 5**.

21.     Article 17.1 of the 2012 New York Agreement states: "In the event a grievance involving the interpretation or application of any of the provisions of this Agreement is not satisfactorily resolved following the grievance procedure, the Union must request that the matter proceed to arbitration within sixty (60) calendar days following the company's final written reply. Selection of the arbitrator and conduct of the arbitration shall be under the existing labor arbitration rules of the American Arbitration Association unless mutually waived by the parties."

22.     The CWA demanded arbitration over the Grievance "as provided in Article 17.1" of the 2012 New York Agreement by letter dated December 9, 2015. A true and accurate copy of that letter is attached as **Exhibit 6**.

23.     The hearing on the Grievance before the Arbitrator was held in Buffalo, New York on March 20, August 15, and August 20, 2018.

24.     The parties submitted post-hearing briefs on November 7, 2018, true and accurate copies of which are attached as **Exhibits 7-8**.

55402429v.2

25.     A true and accurate copy of the transcript of the hearing is attached as **Exhibit 9**. The Arbitrator accepted into evidence forty exhibits: attached Exhibits 3-6 as Joint Exhibits 1-4; attached Exhibit 2 as Company Exhibit 1; twenty-eight additional Company Exhibits, true and accurate copies of which are attached as **Exhibits 10-37**; and seven Union Exhibits, true and accurate copies of which are attached as **Exhibits 38-44**.

26.     During the hearing, the parties stipulated that the following issue was before the Arbitrator: "Did the Company have just cause to terminate the employment of the Grievant, Andrea Mayer? If not what shall be the remedy?"

27.     Article 16.1 of the 2012 New York Agreement provides: "A grievance is a complaint involving the interpretation or application of any of the provisions of this Agreement or a complaint that an employee or group of employees in the bargaining unit has been unfairly treated or otherwise demoted, suspended or discharged without just cause."

28.     The Arbitrator's Award and Opinion ("the Decision") was received by the Company on February 11, 2019. The "Award" section of the Decision states: "The grievance is upheld. The Company did not have just cause to discharge the Grievant, Andrea Mayer. The Grievant shall be reinstated to her position and made whole for her lost income and benefits, minus interim earnings. This Award is final and binding. I shall retain jurisdiction, however, for the limited purpose of resolving any issues that may arise with respect to the remedy herein."

29.     Article 17.2 of the 2012 New York Agreement states: "The decision of the arbitrator shall be final and binding upon both parties, and shall not be subject to other legal challenge. The arbitrator shall have no authority to add to, subtract from, or modify any provision of this Agreement, nor to rule on any question except whether the Agreement has been violated and if so to provide a remedy."

5

30.     Article 16.4 of the 2012 New York Agreement states: "Grievances must be presented within thirty (30) calendar days of the occurrence which gave rise to the grievance. Notification of appeal shall be in writing at Steps 2 and 3 and shall set forth the act or occurrence grieved, the name or names of employees aggrieved where practical, the contract provision alleged to have been violated, if any, and the remedy requested."

31.     Article 17.4 of the 2012 New York Agreement states: "Cases involving discipline or discharge of employees may not be submitted to arbitration or other legal challenge for employees with less than twelve (12) months of service."

32.     Mayer's "service date" was May 27, 2014, as reflected by Company Exhibit 18 and explained by the unrebutted testimony of John Hancheck ("Hancheck"). A true and accurate copy of Company Exhibit 18 is attached as Exhibit 27. As discussed in the Decision, Hancheck was an HR Business Partner for the Buffalo Unit during Mayer's employment and had held various operations, sales, human resources, and labor relations roles during the prior twenty-plus years at the Company and its various predecessors.

33.     At all relevant times, employees in the Card Check Units have sold advertising in "yellow pages" directories as well as "digital" advertising products and services. Although there have been a variety of job titles, the sales employees can be divided into two groups: outside-sales employees and inside-sales employees.

34.     Mayer was first employed as an inside-sales employee, in the "telephone sales representative" job title at a Company facility in Williamsville, New York.

35.     As the Decision notes, Kelly Miller ("Miller"), Regional Vice President, "interviewed" Mayer and "promoted" her to a "premise sales representative" position. Mayer then began working in that outside-sales position beginning on October 19, 2014.

36.     As a premise sales representative, Mayer's direct supervisor was Paul Colosimo ("Colosimo"), who oversaw the outside-sales employees of the Buffalo Sales Office. Mayer was one of approximately seven outside-sales employees at the Buffalo Sales Office. Colosimo reported to Miller, who oversaw multiple sales offices and had jurisdiction over approximately ninety-five outside-sales employees.

37.     Mayer worked as a premise sales representative out of the Company's Williamsville facility until January 2015, when the Company closed its physical sales offices and Mayer and the Company's other outside-sales employees began working out of their homes or other remote locations. Mayer resided in Lancaster, New York.

38.     The Decision explains that Mayer's "new job required her to work remotely, either out of her home or other locations, to visit and meet with customers and potential customers, and to sell yellow pages advertising and/or other digital advertising products. She was to handle renewals for and also seek to sell new products to existing customers, and importantly, she was required to solicit new customers and new business."

39.     The Company established annual revenue objectives or "quotas" for employees in terms of a percentage of the prior year's revenue, which served as the basis for the sales incentive plan. Generally speaking, the plans always have included "buckets" for three types of sales: "new," money brought in from new customers; "increase," money from a current customer greater than what it spent the prior year; and "renewal," money from a current advertiser equal or less than what it had been spending. Based on what it wanted sales people to focus on selling, the Company adjusted how much it pays for particular types of sales. As the Decision discusses, the Company placed a focus on new business in 2015.

40.     Article 9 of the 2012 New York Agreement and each Predecessor Agreement provides that the sales plan "will be implemented in conjunction with [Company] sales policies as adjusted periodically" and that: "Management, in its sole judgment, will establish the objectives and commission rates for every sales representative, taking into account such factors as growth objectives, market conditions, product factors, job title and account assignment."

41.     A "Position Responsibilities" or "PR" policy had been issued by Idearc stating: "This policy is effective May, 2009, and applies to all employees of Idearc Media LLC and affiliated companies." SuperMedia then issued a PR policy stating: "This policy is effective May, 2009 and has been revised as of September 8, 2010. This updated policy applied to all employees of SuperMedia LLC and its affiliated companies." While doing business as Dex Media, the Company issued a PR policy stating: "This policy is effective May, 2009 and has been revised as of September 8, 2010. This updated policy applied to all employees of Dex Media and its affiliated companies." These three PR policies were admitted into evidence as Company Exhibit 15, which is attached as Exhibit 24.

42.     Each version of the PR Policy states: "Position responsibilities are work-related activities, actions or tasks that are required by the business and promote success. Each employee is responsible for meeting the minimum responsibilities of their position as defined and communicated by management. Minimum responsibilities may change from time to time at the discretion of management to accommodate changes in business requirements. If an employee fails to meet the responsibilities of their position, corrective action should be taken."

43.     Each version of the PR Policy also states: "Performance concerns should be managed via the Performance Improvement Process (PIP)."

44.     Appendix B of the 2012 New York Agreement and each Predecessor Agreement includes a "Memorandum of Understanding, Performance Improvement Plan for Sales Representatives" ("the PIP MOU") followed by a "Performance Improvement Plan for Sales Representatives" ("the PIP").

45.     The undisputed evidence before the Arbitrator was that the PIP MOU and the PIP were obtained by VIS during the "off-table" negotiations that led to the model first contract for the Card Check Units, and that paragraph 4 of the PIP MOU reflected a mutual understanding that the CWA would not be able to arbitrate a claim that a discharge in accordance with the PIP was without just cause.

46.     The relevant proposals passed during the 2002-2003 negotiations leading to the PIP and the PIP MOU included in the model first contract were admitted as Company Exhibit 16, which is attached as Exhibit 26.

47.     Konrad — who participated in that bargaining — testified unrebutted that: VIS explained the purpose of the language was ensuring that terminations in accordance with the PIP could not be challenged for lacking just cause, and the CWA expressed an understanding "that if somebody was terminated under the PIP it would be considered just cause."

48.     In each Agreement, the PIP set forth a process that could lead to the termination of an employee for poor "sales results." The PIP in each Agreement provided that premise and telephone sales representatives "will be placed on a PIP" if neither an "achieving" standard nor "peer group" standard is satisfied. Under the 2012 New York Agreement, the achieving standard is satisfied by "100% cumulative quota attainment" over the prior twelve months, while the peer group standard is based on a rank "by job title and office location" and satisfied if the employee is "in the fourth (4th) quintile or higher of peer group."

9

49.     Substantially the same PIP MOU was included in each Agreement. Paragraph 4 in the First Contract's PIP MOU references "cause" and "Article 5.1," while the PIP MOU in each subsequent Agreement references "just cause" and "Article 16.1." The only other changes since the First Contract had been to the name of the employer and the term of the agreement.

50.     The PIP MOU included in the 2012 New York Agreement states in full:

SuperMedia and Communications Workers of America ("CWA") agree as follows:

1.     Appended to this Memorandum is SuperMedia's current policy regarding Performance Improvement Plans ("PIP").

2.     SuperMedia will not, for the term of the contract, change the PIP policy, as it relates to performance by Sales Representatives who have been in a position 18 months of longer. SuperMedia may change the PIP policy as it relates to performance by Sales Representatives who have been in a position less than 18 month after providing the CWA with notice and a reasonable opportunity to comment.

3.     Employees who commence PIPs while in their probationary periods will not be allowed to challenge discharge, demotion, or other discipline at arbitration on in any other legal forum. For the purpose of the PIP policy, probationary employees are those who are in their current position for less than 18 months.

4.     As to employees who have completed their probationary periods and are placed in a PIP, the application of "just cause" referenced in Article 16.1 shall only be interpreted to mean that management applied the proper process as set forth in the PIP policy. The Company retains the sole responsibility to set standards of performance unless specified in the PIP policy.

5.     The parties acknowledge that there may be circumstances when the Company may determine to demote rather to terminate employees who fail PIPs. Therefore, in any arbitration in which the Union challenges the type of discipline received by an employee for not meeting performance standards, the Union shall not make any "disparate treatment" claim based on SuperMedia's treatment of other employees.

This Memorandum of Understanding is effective May 7, 2012 and shall expire on October 11, 2014. The parties specifically agree that the terms and conditions set forth is [sic] this Memorandum of Understanding shall not survive the expiration of this Memorandum of Understanding unless agreed to by the parties in writing.

51.     Mayer was always a "probationary employee" for "the purposes of the PIP Policy" as defined by paragraph 3 of the PIP MOU; as the Decision notes, Mayer was "a short-term employee who worked for the Company approximately fifteen (15) months only."

52.     The Company did not use the PIP process set forth in the 2012 New York Agreement to discipline Mayer, who was never "placed in a PIP."

53.     The Decision notes that the Company had "suspended the use of the PIP" during the relevant period in 2015, and explains that a "Performance Ranking Report ('PPR'), a rolling measure of an employee's prior twenty-six pay period sales, was a component of the PIP process" and "was not being generated."

54.     The unrebutted evidence before the Arbitrator was that the parties had never agreed that the existence of the PIP process would limit the Company's ability to utilize its PR policy to progressively discipline employees for just cause.

55.     The Decision notes that Dickson testified that "the Company never agreed that the PIP would be the only methodology used to segment and discipline sales representatives for performance issues" based on her "over forty (40) years experience in the industry" and "familiarity with the Company iterations over the years [] as well as  the various collective bargaining agreement negotiated." No evidence rebutted her testimony.

56.     The Decision also notes that Dickson testified that the PR Policy and PIP were two "distinct and separate tracts to monitor and, if necessary, discipline sales employees," that (1) the PR Policy dealt with "basic job activities (eg, properly pacing the work, meeting canvass benchmarks, reporting sales activities, closing and uploading sales, and meeting other business needs)" and (2) the PIP was "used for sales performance concerns and outcomes (eg, tracking sales objectives and targets, performance results etc.)." No evidence rebutted her testimony.

57.     The parties' agreements in effect throughout Mayer's employment, specifically paragraph 7 of the 2011 PIP MOA, provided that the PIP did not limit the Company's "separate right" to use "progressive discipline separate from the PIP process."

58.     Paragraph 7 of the 2011 PIP MOA provides in full: "The parties reaffirm that the PIP establishes a standard process for performance improvement when a sales representative's performance consistently falls below the minimum performance standard. The parties further acknowledge the company's separate right to address a sales representative's failure to perform functions of the job that contribute to a failure to meet the performance standard through progressive discipline separate from the PIP process. An example of such failure would be a representative who does not meet the standard for new/non sales which is the direct result of the representative's repeated failure to schedule and/or keep new/non-customer appointments. It is not the company's intention to apply discipline outside the PIP process for sales performance that is below a minimum standard when the representative is performing the required functions of his/her job."

59.     The PR Policy always set forth a progressive discipline process, explaining that "Step 1" was a "Written Warning," "Step 2" was "Final Warning," and: "If position responsibilities are not met during the final warning period, additional corrective action may be taken, up to and including, dismissal. If the responsibilities have been met, the supervisor may discontinue the warning and advise the employee of their successful completion of the warning."

60.     On May 18, 2015, Mayer was issued a Written Warning under the PR Policy. As the Decision notes, Mayer was "still behind on pacing and her overall sales activity was not improving" and she "was not cold-calling and had not made a new sale in over thirty (30) days."

61.     The Arbitrator found that "the Company's overriding concern in deciding to place Mayer on a PR was her performance as it related to new sales," noting testimony that "even top performers (ie, those in the upper quintiles of the employee ranking system) could be placed on a PR for the lack of new sales."

62.     The Decision does not dispute that the failure to sell new business was a reasonable basis to be concerned that the employee is not performing the basic requirements of the job. Miller testified that an employee who regularly calls on customers will sell new business, and that a failure to sell new business invites an inspection of whether the employee is calling on customers. Mayer testified that it is substantially easier to sell renewals without physically visiting a customer.

63.     Hancheck testified unrebutted that the Company had prepared "boilerplate" requirements for PR Plans, which could be amended by the manager but were not for Mayer.

64.     The undisputed evidence was that selling new business was neither necessary nor sufficient to satisfy the requirements of the PR Plan. Miller testified that Mayer was not fired for the failure to sell to new advertisers, and that it was not a requirement of her PR plan. As the Decision notes, Michael Moore — who was a former telephone sales representative in the Buffalo Unit and former steward — testified that he had been placed on a PR Plan and "was not removed" from it "even after obtaining five (5) new sales" because he "didn't have enough phone time."

65.     The PR Plan required Mayer to identify ten "new business prospects" each day and email the list to Colosimo each morning, provide Colosimo with an update of what was uncovered during her presentations to clients every afternoon, report her activity each day in the Company's Salesforce platform, prepare for each prospect and call on the prospects while also handling existing clients, and, each week, have four "unique second appointments with the decision maker" and a total of fifteen appointments with new business prospects.

66. The Decision does not dispute that Mayer could have satisfied the PR Plan if she had just performed the basic requirements of the job. Miller and Hancheck each testified in detail and unrebutted how the requirements of Mayer's PR Plan were achievable regardless of an employee's sales skill.

67. During the Written Warning period, which ran through June 8, 2015, Colosimo discussed with Mayer that she was not meeting the requirements. Company Exhibit 21, which is attached as Exhibit 31, is a running record of Mayer's PR Plan. It includes entries reflecting that, on various days between May 20 and June 5, Colosimo told Mayer that "too much time has been spent on researching leads as opposed to calling/walking in," that "you don't have any appointments booked," that she had to continue to handle existing advertisers and that they had discussed "walking in on accounts that have not been responding," and that he had "not received any leads via email this week."

68. On June 8, 2015, Colosimo explained to Mayer that she was being put on Final Warning through July 6, 2015.

69. The Decision notes that the Written Warning "contained detailed, required sales activities as well as a written warning," and that the Company found Mayer was not "satisfying the requirements" of the PR Plan and "therefore extended" the PR Plan and "issued a final warning."

70. The CWA did not file a grievance relating to the Written Warning or Final Warning issued to Mayer within the thirty-day limitations period of Article 16.4.

71. The Company never agreed that the Arbitrator would have authority to resolve whether the Written Warning or Final Warning issued to Mayer had violated any agreement.

72.     The Company decided to fire Mayer at the end of the Final Warning period. She went out on a leave on the last day of her Final Warning period, July 6, 2015, after the termination decision had been made but before it was communicated to her. She applied for short-term disability benefits and returned to work after that application was denied. The day she returned, August 10, 2015, the termination decision was communicated to her.

73.     The undisputed evidence before the Arbitrator was that Mayer failed to "come close" to meeting the requirements of her PR Plan, during both the Written Warning and Final Warning periods. Miller testified to that effect, and Mayer testified that Miller was correct. As the Decision notes, Mayer "did not have, for example, a daily minimum of (10) new business prospects identified nor did she communicate them." Mayer specifically testified that she did not update her records daily as required, and that she recalled emailing the required daily list of ten prospects "at least once" but was otherwise not sure how many times she sent the list.

74.     The Decision acknowledges that the Company fired Mayer upon concluding that she "simply was not working" after "reviewing her recent activity and noting the very few customer appointments that she had scheduled." Prior to the termination decision, Miller reviewed how often Mayer and her peers had called on customers during the first six months of 2015. As the Decision notes, Miller discovered that there were "eleven (11) days when [Mayer] never even saw one (1) client," that "it was 'very rare' for [Mayer] to have appointment in the morning or after 3:00 p.m.," and that Mayer's "peers averaged two hundred and forty-two (242) appointments in the first six (6) months of 2015" while Mayer "had one hundred and twenty-five (125) only." Miller testified unrebutted that the peer with the second fewest appointments had 186 during the first six months of 2015, almost 50% more than Mayer.

75.     The Decision does not challenge the Company's conclusion that Mayer was not calling on customer as the position required. During the grievance process, the CWA never claimed that Mayer was making the calls and appointments that the position required. After Mayer's termination, Miller reviewed the mileage reimbursement report for Mayer and her peers. Miller testified unrebutted that Mayer's report looked good at the beginning of her time as a premise sales representative but was predominantly for personal trips during the last couple months of her employment.  As the Decision notes, Miller discovered that Mayer's peers were reimbursed for more than 9,000 miles on average while Mayer was reimbursed for 4,600 miles, half of which "was for personal use." During the hearing, neither Mayer nor Moore attempted to claim that Mayer was actually working.

76.     The Arbitrator nonetheless concluded that the Company "should have utilized the PIP, and not a PR plan," that "the parties' agreement that details PIP procedures to be followed in cases of sales performance was violated," and that therefore "the Company did not have just cause to discharge the Grievant, Andrea Mayer."

## Grounds To Vacate The Award

77.     Paragraphs 1 through 76 are incorporated by reference as if fully set forth herein.

78.     To the extent that the Arbitrator based the Decision upon the Company's decision to place Mayer on a PR Plan and issue a Written Warning on May 18, 2015, the Arbitrator exceeded his authority and dispensed his own brand of industrial justice. That Company decision was not arbitrable under Article 17.4 of the 2012 New York Agreement because Mayer had "less than twelve (12) months of service."  That Company decision also not arbitrable under Article 16.4 of the 2012 New York Agreement because the CWA did not present a relevant grievance "within (30) calendar days of the occurrence which gave rise to the grievance."

16

79.     To the extent that the Arbitrator based the Decision upon the Company's decision to extend Mayer's PR Plan and issue a Final Warning on June 8, 2015, the Arbitrator exceeded his authority and dispensed his own brand of industrial justice. That Company decision was not arbitrable under Article 16.4 of the 2012 New York Agreement because the CWA did not present a relevant grievance "within (30) calendar days of the occurrence which gave rise to the grievance."

80.     To the extent that the Arbitrator based the Decision upon paragraph 4 of the PIP MOU, the Arbitrator exceeded his authority and dispensed his own brand of industrial justice. Paragraph 4 of the PIP MOU addresses only "employees who have completed their probationary periods and been placed in a PIP." That contractual language could not apply to Mayer because she had not completed her "probationary period" for "the purpose of the PIP policy" as defined by paragraph 3 of the PIP MOU. That contractual language also could not apply to Mayer because she had not been "placed in a PIP."

81.     To the extent that the Arbitrator based the Decision upon a theory that the Company could not use the PR Policy to discipline Mayer because of the existence of the PIP, the Arbitrator exceeded his authority and dispensed his own brand of industrial justice. The 2011 PIP MOA recognizes "the company's separate right to address a sales representative's failure to perform functions of the job that contribute to a failure to meet the performance standard through progressive discipline separate from the PIP process" and specifies that an "example of such failure would be a representative who does not meet the standard for new/non sales which is the direct result of the representative's repeated failure to schedule and/or keep new/non-customer appointments."

55402429v.2

82.     In sum, the Decision must be vacated because it is contrary to Article 17.2 of the

2012 New York Agreement, which provides that: "The arbitrator shall have no authority to add to,

subtract from, or modify any provision of this Agreement, nor to rule on any question except

whether the Agreement has been violated and if so to provide a remedy."

### Prayer for Relief

WHEREFORE, Petitioner prays for relief against Respondent as follows:

1.      An order vacating the Decision;

2.      An order determining that Petitioner had just cause to terminate Mayer; and

3.      Any further relief as the Court deems just and proper.


Dated: New York, New York
       March 11, 2019

SEYFARTH SHAW LLP

By:*/s/ Howard M. Wexler*
        Howard M. Wexler
        620 Eighth Avenue, 32nd Floor
        New York, New York 10018
        Tel.: (212) 218-5500
        Fax: (212) 218-5526
        hwexler@seyfarth.com

*Attorneys for Petitioner*